# IN THE SUPREME COURT OF TEXAS

═══════════════

No. 15-0968

═══════════════

LONGVIEW ENERGY COMPANY, PETITIONER,

v.

THE HUFF ENERGY FUND LP, WRH ENERGY PARTNERS LLC, WILLIAM R. "BILL"
HUFF, RICK D'ANGELO AND RILEY-HUFF ENERGY GROUP LLC, RESPONDENTS

═══════════════════════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTH DISTRICT OF TEXAS

═══════════════════════════════════════════════════════════════

**Argued February 9, 2017**

JUSTICE JOHNSON delivered the opinion of the Court.

JUSTICE GUZMAN did not participate in the decision.

This case involves the questions of whether two directors breached their fiduciary duties to a

corporation, and if so, whether the evidence and jury findings support the remedies imposed by the trial

court.

Longview Energy Company sued two of its directors and entities associated with them after

discovering one of the entities, Riley-Huff Energy Group LLC, purchased mineral leases in an area where

Longview had been investigating the possibility of buying leases. The case was tried to a jury, which found

that the directors breached their fiduciary duties to Longview in two ways: by usurping a corporate

opportunity, and by competing with the corporation without disclosing the competition to Longview's Board of Directors. The jury also found that Riley-Huff acquired leases as a result of the breaches. The trial court rendered judgment awarding a constructive trust to Longview on most of the leases in question and related property. The judgment also required the disgorgement of money derived from past lease production revenues.

The court of appeals reversed and rendered judgment for the defendants. It concluded that (1) the evidence was legally insufficient to support the jury's finding that the directors breached their fiduciary duties by usurping a corporate opportunity, and (2) the pleadings were not sufficient to support a claim for breach of fiduciary duty by undisclosed competition with the corporation.

We affirm.

## I. Background

Longview Energy Company is an oil and gas exploration and production company incorporated in Delaware and headquartered in Dallas. During the time relevant to this matter, Longview had investments in mineral operations in Arkansas, California, Louisiana, Mississippi, and Oklahoma. The Huff Energy Fund LP (HEF) is a Delaware limited partnership that invests in energy companies. In 2006, HEF purchased shares in Longview for $19 million, then purchased more shares for $20 million in 2007. Pursuant to the purchase agreement and its position as the major shareholder owning approximately 39% of Longview's shares, HEF had Bill Huff and Rick D'Angelo—HEF's Chief Executive Officer and lead investment evaluator, respectively—appointed to serve as two of Longview's nine-member board of directors.

2

As drilling and mineral recovery technologies developed and became more efficient, certain types of mineral-containing formations became more valuable. The Eagle Ford Shale (the Eagle Ford) was one such formation. Many investors and companies became focused on South Texas, where the formation, estimated to encompass as many as thirteen million acres, was mainly located. HEF asked its portfolio companies, including Longview, to look into investment opportunities related to the Eagle Ford.

During the summer of 2009, HEF began discussions with Bobby Riley about possible investment opportunities related to the Eagle Ford. In September 2009, Riley and HEF consummated a deal whereby they purchased some mineral leases in areas where production from the Eagle Ford was anticipated. In October 2009, HEF and Riley joined forces and created Riley-Huff Energy Group LLC (Riley-Huff). Riley-Huff continued investigating investments in Eagle Ford acreage pursuant to the interest both Riley and HEF had in the formation.

Also in September 2009, HEF representatives, including both Huff and D'Angelo, met with Longview and encouraged it to consider investing in Eagle Ford acreage. Longview claims Huff stated that if it located an investment in Eagle Ford acreage that Rick Pearce—a senior petroleum engineer and Longview's Chief Operating Officer—liked, HEF would fund the investment.

Following the September meeting, Longview focused a substantial part of its resources on investigating possible investments in Eagle Ford acreage. As part of that process, Longview hired geologist and geophysicist Mark Lober as a consultant. Lober identified and advised Longview of an oil "window" in Eagle Ford acreage that he believed would be productive (the Lober window). Longview also began working with lease brokers Tamara Ford and Pat Gooden to determine what Eagle Ford acreage might

3

be available. In December 2009, Longview's management and Lober met with brokers Ford and Gooden, who generally described tracts available for lease, discussed lease terms, and gave Longview a map with circles noted on it locating general areas of available acreage called "blobs." The amount of acreage located within the blobs is described variously in the record as ranging from 235,000 to 254,000 acres. The brokers would not identify specific acreage or lease locations in order to protect their interests with regard to any future leasing transactions. D'Angelo requested that Longview mail copies of the brokers' map to him, which it did on December 23, 2009. During this time D'Angelo continued to express enthusiasm about the possibility of Longview investing in Eagle Ford acreage.

Longview scheduled a board of directors' meeting for January 28, 2010, to review the materials its investigation had produced, and for its board to consider whether to invest in Eagle Ford acreage. Shortly before the meeting Longview provided materials to the board members, including a proposed investment and development strategy and economic projections. The proposal was to invest up to $40 million to lease 7,000 acres in each of three different locations for a total of 21,000 acres, drill one well per lease tract to prove up its mineral-producing capability, then sell packages of leases in the areas that produced. The proposal neither identified nor targeted any specific acreage or leases in the large blobs described by brokers Ford and Gooden. The proposal was to partner with another entity in acquiring the leases and drilling the wells. Longview was counting on the promise Huff made in September 2009 to fund its part of the project.

After Longview presented its proposal at the January 28 board meeting, D'Angelo announced that HEF would not support an investment in Eagle Ford acreage. As a result, the board did not vote on

4

whether to pursue the proposed strategy. After the meeting, a Longview representative informed Lober and Gooden that the board decided not to invest in Eagle Ford acreage. Gooden asked if Longview objected to his submitting lease acreage to other HEF portfolio companies, which Longview did not. At the next meeting of Longview's board on February 1, 2010, the possibility of using sources of funding other than HEF for investing in Eagle Ford acreage was discussed. The other possibilities included using internally generated cash flow and selling assets such as those Longview owned in Oklahoma. Longview claims that D'Angelo strongly objected to selling the Oklahoma assets. After minutes of the board meeting were circulated, D'Angelo emailed Longview, stating that he did not agree with the minutes. In the email D'Angelo explained that his opposition to selling the Oklahoma assets was due to the lack of a formal process for appraising the assets before offering them for sale.

In light of D'Angelo's position and the board's concern about possible legal action by HEF if the proposal to sell assets and invest in Eagle Ford acreage proceeded, the Longview board did not pursue investing in the Eagle Ford.

Longview later learned that HEF and Riley had formed Riley-Huff in October 2009 to locate and fund oil and gas investments, including investing in Eagle Ford acreage; that D'Angelo was a manager of Riley-Huff; and that HEF was a limited partner with a 99% ownership interest. Neither Huff nor D'Angelo had disclosed Riley-Huff's existence to Longview's board. Longview also learned that three days before its January 28 board meeting, Riley-Huff agreed to purchase Eagle Ford leases from Ford's company, Wyldfire, which was one of the lease brokers Longview consulted in developing the proposal it presented

5

to its board. Riley-Huff eventually acquired mineral leases to approximately 50,000 Eagle Ford acres, approximately 5,200 of which were within the blobs on maps Longview's board had considered.

In September 2011, Longview sued the parties involved in Riley-Huff's acquisition of Eagle Ford acreage leases (collectively, the Huff Defendants).[1] Longview alleged various causes of action, including fraud, breach of fiduciary duty, usurpation of corporate opportunity, tortious interference with business relationships, misappropriation of trade secrets, aiding and abetting, and conspiracy.

The case was tried to a jury, with two liability questions submitted in the charge. In response to Question 1, the jury found that Huff and D'Angelo breached their fiduciary duties to Longview by taking a corporate opportunity. In response to Question 2, the jury found that Huff and D'Angelo breached their fiduciary duties to Longview by engaging in competition with Longview without the informed approval of its board of directors. The jury also found that Riley-Huff wrongfully obtained assets in the Eagle Ford as a result of breaches of fiduciary duties by Huff and D'Angelo. Based on affirmative answers to the breach of fiduciary duty questions, the jury answered questions regarding the market value of the Eagle Ford assets Riley-Huff acquired as a result of the breaches of fiduciary duties; the amount Riley-Huff paid for its Eagle Ford assets; the amount of past production revenues acquired from the Eagle Ford assets as a result of the breaches of fiduciary duties by Huff and D'Angelo; and the amount Riley-Huff paid to develop its Eagle Ford assets. The trial court rendered judgment awarding Longview $95.5 million; imposing a constructive trust in Longview's favor on substantially all Riley-Huff's Eagle Ford acreage leases and associated

---

[1] Defendants included the Huff Energy Fund, LP, WRH Energy Partners, LLC, W.R. Huff Asset Management Co., William R. "Bill" Huff, Rick D'Angelo, Ed Dartley, Bryan Bloom, Riley-Huff Energy Group, LLC, and Bobby Riley. Longview also sued Tamara Ford and Wyldfire Energy, Inc., but later nonsuited them.

properties, together with future production from the leases; and ordering Riley-Huff to transfer the leases and properties to Longview.

The Huff Defendants appealed. In a plurality opinion, the court of appeals reversed and rendered a take-nothing judgment in favor of the Huff Defendants. 482 S.W.3d 184 (Tex. App.—San Antonio 2015). First, the court determined that the evidence was legally insufficient to support the "yes" answer to jury Question 1 regarding the claim for taking a corporate opportunity. *Id*. at 193–94. Although acreage where Longview considered buying leases partially overlapped with acreage Riley-Huff leased, the court reasoned that Longview had not identified any specific leases in the proposal to its directors, and Riley-Huff's acquisitions did not "hinder or defeat the plans and purposes of the corporation." *Id*. at 191–93. Because millions of acres in the Eagle Ford were still available to be leased, the court concluded that legally sufficient evidence did not support the implied finding that Longview had "an interest or a reasonable expectancy in the opportunity." *Id*. at 193–94. Next, the court held that the petition on which Longview went to trial did not plead a claim for breach of the fiduciary duty of loyalty by competition without disclosure to Longview's board, and thus a judgment could not be based on the jury's finding that Huff and D'Angelo breached their fiduciary duties by undisclosed competition with Longview. *Id*. at 197.

Because of its determinations regarding the breaches of fiduciary duties, the court of appeals did not address other issues raised by the parties. In this Court, the parties address all the issues and cross-issues raised. The Huff Defendants urge that if we determine the court of appeals erred, then to avoid delay and in the interest of judicial economy we should address the remaining issues rather than remanding to the court of appeals for it to do so. *See G. T. Leach Builders LLC v. Sapphire V.P., LP*, 458 S.W.3d 502,

511 (Tex. 2015); *Rusk State Hosp. v. Black*, 392 S.W.3d 88, 97 (Tex. 2012). We agree in principle with that approach. And as we explain below, we conclude that a cross-issue urged by the Huff Defendants is dispositive. In order to address that issue, we will assume, without deciding, that a claim against directors for competing with the corporation without disclosure to and approval by the corporation's board is viable under Delaware law and that the court of appeals erred by holding that Longview's pleadings were not sufficient to support such a claim. We will further assume that the evidence is sufficient to support the jury's finding that Huff and D'Angelo breached both that duty and their duty to not take a corporate opportunity. Those assumptions lead to our considering the Huff Defendants' cross-issue that there is no evidence tracing Riley-Huff's acquisition of any specific leases to the breaches. On that cross-issue we agree with the Huff Defendants, which leads us to conclude that there is no evidence to support the trial court's damages award.

## II. Applicable Law

Under choice of law principles, Texas courts apply the law of the jurisdiction that has the most significant relationship to the particular substantive issue to be resolved. *See Sonat Expl. Co. v. Cudd Pressure Control, Inc.*, 271 S.W.3d 228, 233 (Tex. 2008). The parties agree that Delaware law applies to substantive issues. The law of Texas, as the forum state, governs matters of procedure. *Arkoma Basin Expl. Co. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 387 n.17 (Tex. 2008); *see also California v. Copus*, 309 S.W.2d 227, 230 (Tex. 1958). We conduct our review accordingly.

8

### III. Discussion

### A. Constructive Trust

Jury Question 5, which the parties reference as the basis for the trial court's imposition of a constructive trust on Riley-Huff's leases and associated properties, was:

> Did Riley-Huff Energy Group LLC wrongfully obtain assets in the Eagle Ford shale as a result of Rick D'Angelo's or Bill Huff's failure, if any, to comply with his or their fiduciary duty?

The jury answered "yes."

The Huff Defendants argue, among other things, that the constructive trust award is erroneous because: (1) nothing in the judgment traces the assets in the constructive trust to fiduciary breaches, and (2) Longview failed to submit a jury question tracing the specific assets to any fiduciary breaches.

In response, Longview asserts that the Huff Defendants did not preserve error by their objection, and even if they did, they are wrong on the evidence: the evidence shows all the leases on which the constructive trust was imposed were acquired as a result of Huff's or D'Angelo's breaches of their fiduciary duties. Thus, Longview maintains, the evidence and jury findings support the jury's answer, and any necessary findings not made by the jury are deemed to have been made by the trial court—or should be made by this Court—in support of the judgment. That is because a constructive trust is an independent ground of recovery and the jury found an element of it when it answered Question 5. Longview also posits that (1) once it proved that assets were commingled, the burden shifted to the Huff Defendants to trace the assets that were acquired independently of D'Angelo's and Huff's breaches of fiduciary duties, and (2) the

9

trial court's equitable powers include the power to determine the scope of a constructive trust and evidence supports the trial court's determination.

First, we must address Longview's contention that the Huff Defendants did not preserve error by their objections. The Huff Defendants objected to Question 5 on several grounds, including the grounds that (1) there was "no evidence of identifiable property belonging to Longview which ended up in Riley-Huff's possession," and (2) "to the extent Longview seeks to use Question Number 5 as a basis for constructive trust over Riley-Huff's assets, Longview's claim for a constructive trust fails because it cannot trace by strict proof or otherwise something misappropriated from it to an identifiable res." By those objections, the Huff Defendants clearly preserved error as to the legal sufficiency of the evidence to support tracing any specific lease Riley-Huff acquired to Huff's or D'Angelo's breaches of fiduciary duties. *See* TEX. R. CIV. P. 274.

Second, we must decide whether tracing was required. Under Delaware law, "a constructive trust is the remedial device through which precedence of self is compelled to give way to the stern demands of loyalty." *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939); *see also Hogg v. Walker*, 622 A.2d 648, 652 (Del. 1993) ("The doctrine of constructive trust effectuates the principle of equity that one who would be unjustly enriched, if permitted to retain property, is under an equitable duty to convey it to the rightful owner."). A "constructive trust is a remedy that relates to specific property or identifiable proceeds of specific property." *Hogg*, 622 A.2d at 652 (citing *McMahon v. New Castle Assocs.*, 532 A.2d 601, 608 (Del. Ch. 1987)). "The constructive trust concept has been applied to the recovery of money, based on tracing an identifiable fund to which plaintiff claims equitable ownership, or where the legal remedy is

10

inadequate—such as the distinctively equitable nature of the right asserted." *Id.*; *see also Triton Constr. Co. v. E. Shore Elec. Servs., Inc.*, No. 3920-VCP, 2009 WL 1387115 (Del. Ch. May 18, 2009) (holding that in order to impose a constructive trust, there must be some "identifiable asset or fund to which equitable title can be traced"), *aff'd*, 988 A.2d 938 (Del. 2010).

Thus, to obtain a constructive trust over these properties located in Texas, Longview must have procedurally proved that the properties, or proceeds from them, were wrongfully obtained, or that the party holding them is unjustly enriched. *See KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 88 (Tex. 2015). "Definitive, designated property, wrongfully withheld from another, is the very heart and soul of the constructive trust theory." *Id.* Imposition of a constructive trust is not simply a vehicle for collecting assets as a form of damages. *Id.* And the tracing requirement must be observed with "reasonable strictness." *Id.* That is, the party seeking a constructive trust on property has the burden to identify the particular property on which it seeks to have a constructive trust imposed.

Longview argues that it did not have the burden to trace because that burden shifted to the Huff Defendants once Longview proved the assets were commingled. The authorities Longview cites in support of its commingling argument are exemplified by *Wilz v. Flournoy*, in which a father used funds from his incapacitated son's account to pay the father's monthly payments on a farm. 228 S.W.3d 674, 676 (Tex. 2007). The mother sued on behalf of her son, and the jury found that the father breached his fiduciary duty. *Id.* The trial court imposed a constructive trust on the entire farm. *Id.* This Court held that a "party seeking to impose a constructive trust has the initial burden of tracing funds to the specific property sought to be recovered." *Id.* Once this burden is met, the entire property is subject to the constructive trust

11

except for the property the trustee can distinguish as his or her separate property. *Id.* The mother presented evidence of tracing by proving that several checks were drawn on the son's account and deposited to the father's personal account, then the deposits were used to make payments on the farm. *Id.* As a result, the burden then shifted to the father to demonstrate what portion of the farm's purchase price and monthly payments came from his own funds. *Id.* However, the father failed to obtain a jury finding on his affirmative claim that part of the money used to purchase the farm came from his personal funds. *Id*. at 676–77. Thus, the trial court did not abuse its discretion in finding that the son was entitled to the entire farm. *Id.*

Longview's argument fails. *Wilz* dealt with a single property on which payments from different sources were made. Similarly, all of the cases Longview relies upon concern property purchased with commingled funds and the courts hold that the tracing burden does not shift to the defendant until the plaintiff satisfies the initial burden of proving commingled funds were used to purchase specific property. *See, e.g.*, *Logan v. Logan*, 156 S.W.2d 507, 511 (Tex. 1941); *Graham v. Turner*, 472 S.W.2d 831, 840 (Tex. App.—Waco 1971, no writ); *Md. Cas. Co. v. Schroeder*, 446 S.W.2d 117, 121 (Tex. App.—El Paso 1969, writ ref'd n.r.e.). Here, in contrast, the leases were separately identifiable, were not purchased with commingled funds, and were identified, lease by lease, in both the evidence and the judgment. Given those facts, Longview had the burden to prove that, as to each lease for which it sought equitable relief of disgorgement or imposition of a constructive trust, Riley-Huff acquired that lease as a result of Huff's or D'Angelo's breaches of fiduciary duties. *See KCM Fin.*, 457 S.W.3d at 88 (holding

12

that a party must establish that the properties it seeks to be disgorged were wrongfully obtained or that the party holding them is unjustly enriched).

A jury does not determine the expediency, necessity, or propriety of equitable relief such as disgorgement or constructive trust. *See Burrow v. Arce*, 997 S.W.2d 229, 245 (Tex. 1999). Whether "a constructive trust should be imposed must be determined by a court based on the equity of the circumstances." *Id.* The scope and application of equitable relief such as a constructive trust "within some limitations, is generally left to the discretion of the court imposing it." *Baker Botts, L.L.P. v. Cailloux*, 224 S.W.3d 723, 736 (Tex. App.—San Antonio 2007, pet. denied). If "contested fact issues must be resolved before a court can determine the expediency, necessity, or propriety of equitable relief, a party is entitled to have a jury resolve the disputed fact issues." *DiGiuseppe v. Lawler*, 269 S.W.3d 588, 596 (Tex. 2008). But uncontroverted issues do not need to be submitted to a jury. *City of Keller v. Wilson*, 168 S.W.3d 802, 815 (Tex. 2005).

The parties do not disagree about what assets Riley-Huff acquired; they disagree about whether there was evidence that any of the assets were acquired as a result of Huff's or D'Angelo's breaches of fiduciary duties. The Huff Defendants say that there was no evidence Longview considered any specific leases, thus there was no evidence to support submission of Question 5, and no evidence to support the jury's answer to it.

Longview argues that there was evidence to support a tracing finding, if one was required, and an element of the requirements for a constructive trust was submitted to the jury, the jury found in its favor, and the trial court could have, and necessarily did, deem any other findings necessary to support its

13

judgment. *See* TEX. R. CIV. P. 279 (elements of a ground of recovery are deemed found by the trial court in favor of its judgment if (1) an element of an independent ground of recovery was submitted to and found by the jury; (2) elements were omitted without objection; and (3) the submitted element was "necessarily referable" to the same ground of recovery as the omitted elements). But even if we assume a deemed finding on tracing, and that the Huff Defendants' objections were not sufficient to alert the trial court of the omission of the tracing element from the charge, we must still determine whether there was evidence to support a deemed finding. *See Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 229 (Tex. 2011) (noting that when an element of a claim is omitted from the jury charge without objection and no written findings are made by the trial court, the omitted element is deemed found if there is legally sufficient evidence to support the deemed finding); *see also Ramos v. Frito-Lay, Inc.*, 784 S.W.2d 667, 668 (Tex. 1990) (providing that an omitted element will be deemed found if supported by some evidence).

Longview contends that undisputed evidence identified the leases the trial court ordered subjected to a constructive trust as having been acquired by Riley-Huff as a result of Huff's or D'Angelo's breaches of fiduciary duties. The Huff Defendants agree that the evidence was undisputed as to each of the leases Riley-Huff acquired, including the location and origin of each of them. But in diametric opposition to Longview's position, they contend, as they did in the trial court, there was no evidence Riley-Huff acquired any specific lease as a result of the breaches of fiduciary duties by Huff or D'Angelo. We agree with the Huff Defendants.

It is undisputed that the lease brokers identified and presented only blobs containing, in the aggregate, at least 235,000 acres for Longview to consider in deciding whether to purchase leases on

14

21,000 acres. There must have been evidence tracing a breach of fiduciary duty by Huff or D'Angelo to specific leases in order to support the imposition of a constructive trust on those leases. *See KCM Fin.*, 457 S.W.3d at 88 (providing that a constructive trust cannot be imposed where the tracing element is not met). The court of appeals noted, and we agree, that there is no evidence any specific leases or acreage for leasing were identified by the brokers as possible targets for Longview to purchase or lease, nor is there evidence that any specific leases or acreage for leasing were recommended to or selected by Longview or its board for pursuit or purchase. *See* 482 S.W.3d at 191–93. Thus, the evidence in this case is legally insufficient to support a finding tracing any specific leases Riley-Huff acquired to a breach of fiduciary duty by either Huff or D'Angelo. *See KCM Fin.*, 457 S.W.3d at 88 ("In order to fasten a constructive trust on property owned by the defendant, some particular property must be identified as to which plaintiff has an equity."). Accordingly, Longview was not entitled to have a constructive trust imposed on any leases acquired by Riley-Huff or on property associated with them. Nor was Longview entitled to have title to any of the leases or associated properties transferred to it. The trial court erred by rendering judgment imposing the constructive trust on and requiring the transfer of leases and properties to Longview.

### B. Money Judgment

Jury Questions 6 through 9 addressed monetary values and amounts on which the trial court based its judgment awarding Longview $95.5 million. The jury was instructed to answer these questions only if it found in response to either Question 1 or Question 2 that Huff or D'Angelo failed to comply with a fiduciary duty to Longview. The questions were as follows:

15

**Question No. 6**: What is the market value of the assets in the Eagle Ford shale that Riley-Huff Energy Group LLC acquired as a result of Rick D'Angelo's or Bill Huff's failure to comply with his fiduciary duty?

Answer in dollars and cents, if any: Answer: $42,000,000.

**Question No. 7**: What did Riley-Huff Energy Group LLC pay for the assets it acquired in the Eagle Ford shale?

Answer in dollars and cents, if any: Answer: $24,500,000.

**Question No. 8**: What is the amount of past production revenues Riley-Huff Energy Group LLC derived from the assets in the Eagle Ford shale it acquired as a result of Rick D'Angelo's or Bill Huff's failure to comply with his fiduciary duty?

Answer in dollars and cents, if any: Answer: $120,000,000.

**Question No. 9**: What did Riley-Huff Energy Group LLC pay to develop the assets it acquired in the Eagle Ford shale?

Answer in dollars and cents, if any: Answer: $127,000,000.

In addressing the Huff Defendants' challenges to these findings, we will again assume, without deciding, that Longview's claim that the Huff Defendants acquired assets as a result of competition with Longview without disclosure to and approval by Longview's board of directors is recognized under Delaware law, Longview's pleadings were sufficient to support such a claim, and the evidence was sufficient to support the jury's findings that the Huff Defendants breached that duty, as well as the duty to not take a corporate opportunity from Longview.

Addressing the Questions in numerical order, we first consider Question 6. The Huff Defendants challenged the evidentiary support for the question by objecting to it, in part, on the grounds that Longview

had the burden to prove its entitlement to any recovery on a lease-by-lease basis and failed to do so. We agree with that position.

As part of its task in answering Question 6, the jury had to determine what assets—i.e., leases—Riley-Huff acquired as a result of breaches of fiduciary duties by Huff or D'Angelo. Absent findings as to which individual leases were so acquired, the jury could not find the value of the assets. Additionally, any findings as to which leases were acquired as a result of Huff's or D'Angelo's breaches of fiduciary duties had to be supported by evidence. We have already considered whether the evidence was legally sufficient to support the jury's answer to Question 5, which in substance required the same findings as did Question 6 regarding specific leases. Consistent with our analysis and conclusion as to Question 5—that the evidence was legally insufficient to support such findings—we conclude no evidence supported the findings required by Question 6 as to specific leases or specific acreage for leasing that were identified by the brokers as possible targets for Longview to invest in, nor was there evidence that any specific leases or acreage were recommended to or selected by its board for pursuit or purchase. Absent such evidence, the jury's answer to Question 6 was based on legally insufficient evidence and cannot support a judgment for Longview.

The Huff Defendants did not object to either Question 7 or Question 8 on the grounds that there was no evidence to support its submission to the jury. But they objected to Question 8, in part, on grounds that "the valuation should be based on the net of production cost and expenses, including taxes." Longview's counsel responded, "[That] is taken into account by Question 9." The trial court overruled the objection.

17

Longview changed its position as to Questions 8 and 9 after the jury returned its verdict. At that point it did not contend it was entitled to revenues from the assets as found in response to Question 8 net of the development costs found in response to Question 9, which would have resulted in a net loss instead of a net profit. Rather, it contended that the jury's answer to Question 9 could not be used to calculate the net amount Riley-Huff derived from the assets because Question 9 was immaterial—it did not limit the jury to considering only those costs necessary to develop assets acquired through a breach of fiduciary duty by Huff or D'Angelo, which was what Question 8 asked. Thus, Longview maintained—and maintains in this Court—that the answer to Question 9 should be disregarded.

The trial court first rendered judgment that, in part, provided for Longview to recover $95.5 million, "based on the jury's finding regarding the value of past-production revenues derived from the Subject Properties minus the amount the jury found that the defendants paid to acquire the Subject Properties." The court later rendered an amended judgment which deleted the above language and simply ordered that Longview recover $95.5 million without explaining how it arrived at the amount. The Huff Defendants urge that the only explanation for the figure of $95.5 million is that the trial court disregarded the answer to Question 9 and did what it first said it did—reduced the $120 million answer to Question 8 by the $24.5 million answer to Question 7. Longview suggests the same basis for the $95.5 million amount. But Longview continues to maintain that the trial court could have properly considered Question 8 without also considering Question 9 because Question 9 was not limited to the assets Riley-Huff acquired as a result of breaches of fiduciary duties by Huff and D'Angelo, as was Question 8. We agree with Longview's position in part: Question 9 was immaterial. But that does not mean that Longview is correct in whole.

18

Both parties cite Delaware law as controlling the amount recoverable for a breach of fiduciary duty. Delaware law limits disgorgement to a fiduciary's profit. *Guth*, 5 A.2d at 510; *see also Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996) (once disloyalty has been proven, "a fiduciary [may] not *profit* personally from his conduct" (emphasis added)). Whether the amount recoverable is considered substantive or remedial does not matter, because Texas law similarly limits disgorgement to a fiduciary's profits. *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 873 (Tex. 2010) (courts may "disgorge all ill-gotten *profits* from a fiduciary when a fiduciary agent usurps an opportunity properly belonging to a principal, or competes with a principal" (emphasis added)). Thus, under either Delaware or Texas law, the disgorgement award must be based on *profits* Riley-Huff obtained as a result of Huff's or D'Angelo's breaches of fiduciary duties. The amount of profit resulting from a breach of fiduciary duty will generally be a fact question. In this instance, neither party contends that it was not. Under the circumstances, the amount the trial court was authorized to order the Huff Defendants to pay Longview was the amount of profit resulting from Huff's or D'Angelo's breaches of fiduciary duties as found by the jury. But such a question was not submitted to the jury, even though the Huff Defendants specifically pointed out the omission by objecting to Question 8. Question 8 did not require the jury to find how much *profit* Riley-Huff obtained from the assets it acquired by means of Huff's or D'Angelo's breaches; it required the jury to find only the amount of *revenues* Riley-Huff received. And Question 9 did not limit the jury to finding the expenses required to produce the revenues found in answer to Question 8, as Longview has maintained post-verdict. Because the answer to Question 8 submitted an incorrect measure for equitable disgorgement of profit, Longview's post-trial position is that Question 9 is immaterial and should be disregarded (a

19

position with which we have agreed), and there was no other finding which could be used in conjunction with the answer to Question 8 to calculate Riley-Huff's profit, Question 8 and its answer were immaterial. *See W.O. Bankston Nissan v. Walters*, 754 S.W.2d 127, 128 (Tex. 1988).

Because there was legally insufficient evidence to support the jury's answer to Question 6 and the jury's answer to Question 8 was immaterial, there was no basis for the trial court to render judgment in favor of Longview for money, and it erred in doing so.

## IV.  Conclusion

For the reasons set out above, we affirm the judgment of the court of appeals.

_____
Phil Johnson
Justice

**OPINION DELIVERED:** June 9, 2017