**Affirmed in Part; Reversed and Rendered in Part; Reversed and Remanded in Part; and Opinion filed December 5, 2019.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-18-00638-CV

---

**SHANNON MEDICAL CENTER, Appellant**

**V.**

**TRIAD HOLDINGS III, L.L.C., INDIVIDUALLY AND DERIVATIVELY ON BEHALF OF REGIONAL CANCER TREATMENT CENTER, LTD., Appellee**

**On Appeal from the 340th District Court
Tom Green County, Texas
Trial Court Cause No. C150381C**

## O P I N I O N

Shannon Medical Center and Triad Holdings III, L.LC. are general partners in Regional Cancer Treatment Center, Ltd. (the Partnership). The Partnership operates its regional cancer-treatment center (RCTC) on premises leased from Shannon's subsidiary, Shannon Real Estate Services, Inc. (SRES). Shannon, the managing general partner, sued for judicial dissolution of the Partnership so that it

can take over RCTC's operations. Triad, both individually and derivatively on behalf of the Partnership, sued Shannon for breach of common-law and statutory fiduciary duties. In accordance with the jury's verdict, the trial court rendered judgment denying Shannon's request for judicial dissolution and awarding the Partnership actual damages in the amount of excess rent that Shannon bound the Partnership to pay to SRES. The trial court additionally ordered Shannon to pay the identical amount to Triad as equitable disgorgement of profits. Finally, the trial court awarded Triad and the Partnership their attorneys' fees, costs, and expenses. Shannon appeals the judgment.[1]

We affirm the portions of the judgment denying Shannon's request for judicial dissolution and awarding actual damages to the Partnership; however, we reverse the disgorgement award to Triad because there is neither a finding nor evidence of Shannon's profits from the excessive rent charged by, and paid to, a different entity. In light of our disposition of these claims, we reverse the awards of attorney's fees, costs, and expenses, and we remand the case solely for relitigation of this ancillary relief.

## I. BACKGROUND

Since its formation in 1988, the Partnership has operated RCTC from a building constructed by the Trust of the Margaret Shannon Estate. The Trust then transferred the building to Shannon, and in 2007 Shannon transferred the building to its wholly owned subsidiary, SRES. Except for this partnership, Shannon and Triad are competitors.

---

[1] Pursuant to an order by the Supreme Court of Texas, this case was transferred to us from the Third Court of Appeals, and we have applied that court's precedent to the extent that it is inconsistent with our own. *See* TEX. R. APP. P. 41.3.

Under the terms of the Partnership Agreement, the general partners manage and control the Partnership "through and by virtue of their selection of the Partnership Committee and the Managing General Partner." The Partnership Committee consists of one representative of each general partner. For several years Shannon and Triad have been the only general partners. Shannon serves as the managing general partner, for which the Partnership pays Shannon management fees under a separate agreement.

For some time now, Shannon has been attempting to dissolve the Partnership and take over RCTC. The Partnership Agreement provides that the Partnership will dissolve upon the earliest of (a) December 31, 2038; (b) approval of 75% of the partnership units; (c) the Partnership's ceasing to operate a radiotherapy facility; or (d) the occurrence of any other circumstance that, under the Texas Revised Limited Partnership Act,[2] would require dissolution. Shannon has attempted to obtain the right to vote 75% of the partnership units in favor of dissolution.

There originally were three general partners and a varying number of limited partners, but the third general partner left the Partnership and sold its partnership units to Shannon and Triad. With the addition of those units, Shannon owned about 72.32% of the partnership units, Triad owned about 24.35%, and limited partners Drs. Bolen, Gordon, and Hughes owned, respectively, 1.72%, 0.86%, and 0.75%.

## A. The 2012 Lease Amendment

The Partnership's landlord SRES informed the Partnership that it would not renew the Partnership's five-year lease upon its expiration in 2012. SRES offered to withdraw the notice of termination if Triad, as the only other member of the

---

[2] The Act expired in 2010; now see Title 4 of the Texas Business Organizations Code, TEX. BUS. ORGS. CODE ANN. §§ 151.001–154.204.

Partnership Committee, would agree to change the Partnership's name to "Shannon Regional Cancer Treatment Center, Ltd." Triad declined.

Three days before the lease expired, Bryan Horner, who is both Shannon's chief executive officer and SRES's president, sent the Partnership and Triad a lease amendment he had executed on behalf of Shannon, as the Partnership's managing partner, and SRES. The lease raised the Partnership's annual rent of about $16.00/sq. ft. to $31.04/sq. ft., of which $11.79/sq. ft.was purportedly to reimburse SRES for specialized tenant improvements it made to the building for the Partnership's use. The building's features that are characterized as specialized tenant improvements are two vaults designed to contain radiation from the facility's linear accelerators. Contrary to these representations, however, Shannon knew that SRES had not modified the building and that the Trust had included the vaults as part of the building's original construction in 1988.

B.    **Assignment of Voting Rights**

To reach the 75% threshold needed for it to dissolve the Partnership, Shannon proposed voting agreements with the limited partners, offering a guaranteed floor price for a limited partner's units upon dissolution of the Partnership in exchange for the limited partner's proxy. Triad blocked this move by entering into a voting agreement with Dr. Bolen. The Triad-Bolen Voting Agreement is binding upon the parties' successors and assigns and it cannot be assigned absent the other party's written consent. With this agreement, Triad controlled the votes of more than 26% of the Partnership, effectively preventing Shannon from forcing the Partnership to dissolve without Triad's consent.

Shannon subsequently bought some of partnership units that were subject to the Triad-Bolen Voting Agreement before entering into a similar voting agreement with Dr. Hughes. Believing that these transactions gave it the right to vote 75% of

4

the partnership units, Shannon unilaterally issued a "Written Consent" purporting to dissolve the Partnership and transfer the Partnership's assets and liabilities to Shannon. In response, Triad pointed out that its proxy to vote Dr. Bolen's partnership units is binding on Dr. Bolen's successors, so that Triad retains the right to vote those units that Dr. Bolen later sold to Shannon. Shannon concedes this point and agrees that the Written Consent was ineffective.

By the time of trial, Shannon and Triad had purchased all of the limited partners' partnership units, making them the only members of the partnership. Due to the voting agreements, Shannon has the right to vote slightly less than 74% of the partnership units, and Triad has the right to vote slightly more than 26%.

## C. The Lawsuit

Unable to cast the votes of 75% of the partnership units as needed to dissolve the Partnership, Shannon filed this suit for judicial dissolution on the ground that it is not reasonably practicable to carry on the Partnership's business in conformity with its governing documents. Triad counterclaimed in its individual capacity and additionally brought a derivative action on behalf of the Partnership. For clarity, we refer to the derivative claims as if brought by the Partnership directly.

The jury charge contained separate questions asking whether Shannon complied with common-law fiduciary duties, with the statutory duty of loyalty, and with the statutory duty of care. Regardless of the theory of liability, the jury was told to measure the Partnership's damages, if any, by "[t]he amount of any improperly charged rents." The jury found that Shannon did not comply with any of these duties to the Partnership or to Triad and assessed the Partnership damages of $572,725.00, which is equal to the sum of the annual charges of $11.79/sq. ft. of the leased premises over the five-year lease term. This is the amount that Shannon bound the Partnership to pay SRES, purportedly to reimburse SRES for its costs of constructing

5

the vaults. The trial court also included an allegedly unpleaded claim, asking the jury if Shannon committed fraud by non-disclosure against Triad "in connection with the Lease Amendment." The jury then was again asked, "What was the amount of any improperly charged rents," and again answered, "$572.725.00." The jury answered all of Shannon's affirmative-defense questions in the negative and failed to find any of the statutory grounds for judicial dissolution of the Partnership.

The trial court awarded the Partnership actual damages of $572,725.00 as found by the jury for breach of duty. Triad recovered no damages, but the trial court ordered Shannon to pay Triad $572,725.00 as equitable disgorgement of profits. Finally, Shannon was ordered to pay Triad's and the Partnership's attorneys' fees and expenses. Shannon appeals the judgment.

## II. ISSUES PRESENTED

Of Shannon's first two issues, we address only the arguments in Shannon's second issue challenging the jury's finding that Shannon breached its statutory duty of care.[3] In its fourth issue, Shannon seeks reversal of Triad's disgorgement award, and in its fifth issue, Shannon argues that it conclusively established a basis for judicial dissolution of the Partnership. In its two remaining issues, Shannon challenges both the unconditional nature of the award of appellate attorneys' fees and the amount of fees awarded.

Given the differences in the claims and the relief awarded to the Partnership and to Triad individually, we separately address Shannon's appellate arguments concerning the Partnership's claims, Triad's individual claims, and Shannon's

---

[3] Shannon's first two issues challenge the jury's findings on three alternative theories of liability: (1) breach of general, common-law fiduciary duties; (2) breach of the statutory duty of loyalty; and (3) breach of the statutory duty of care. Because we affirm the judgment for the Partnership based on Shannon's breach of the statutory duty of care, it is unnecessary to address the Partnership's alternative liability theories.

6

judicial-dissolution claim, before addressing the incidental relief of attorneys' fees, costs, and expenses.

### III. BREACH OF THE DUTY OF CARE TO THE PARTNERSHIP

In this issue, Shannon maintains that the charge's question regarding breach of the duty of care does not support the judgment because none of the transactions or conduct relied upon give rise to a legally viable claim.[4]

### A.    Question 6: The Charge on the Statutory Duty of Care

Shannon first contends the trial court erroneously charged the jury on breach of the statutory duty of care. A trial court must submit jury questions, instructions, and definitions that "are raised by the written pleadings and the evidence." TEX. R. CIV. P. 278; *United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 469 (Tex. 2017). When reviewing a complaint of charge error, we consider "the pleadings of the parties and the nature of the case, the evidence presented at trial, and the charge in its entirety." *United Scaffolding*, 537 S.W.3d at 469 (quoting *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 862 (Tex. 2009)). We review the trial court's ruling on charge objections and charge requests for abuse of discretion. *Sw. Energy Prod. Co. v. Berry–Helfand*, 491 S.W.3d 699, 727 (Tex. 2016). A trial court abuses its discretion when it acts without reference to guiding rules or principles. *In re Thetford*, 574 S.W.3d 362, 374 (Tex. 2019) (orig. proceeding). Charge error is reversible if, under the totality of these circumstances, the error "amounted to such a denial of the rights of the complaining party as was reasonably calculated and probably did cause the rendition of an improper judgment." *United Scaffolding*, 537

---

[4] Although this question pertains both to the Partnership and to Triad individually, we dispose of the judgment for Triad on other grounds. *See* Section IV, *infra*.

S.W.3d at 469 (quoting *Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex. 1986) (op. on reh'g)).

Question 6 of the charge addressed the duty of care as follows:

Did Shannon comply with its duty of care to [Triad] and the Partnership?

> As a partner in the Partnership, Shannon owes [Triad] and the Partnership a duty of care. Shannon must discharge this duty and conduct the Partnership business (1) in good faith and (2) in a manner that Shannon reasonably believes to be in the best interest of the Partnership.

> To prove it complied with its duty of care, Shannon must show that, in conducting the Partnership's business, it acted with the care of an ordinarily prudent person in similar circumstances. An error in judgment does not by itself constitute a breach of the duty of care.

> A partner is presumed to have satisfied the duty of care if the partner acted on an informed basis, in good faith, and in a manner that the partner reasonably believed to be in the best interest of the Partnership.

> A partner does not violate a duty or obligation merely because the partner's conduct furthers the partner's own interests.

The jury answered "no" as to both Triad and the Partnership. A "no" answer to Question 6 was one of several alternative predicates to Question 7, in which the jury was asked to determine the amount that would compensate the Partnership for its damages, if any, "that were proximately caused by the non-compliant conduct." The jury was instructed to consider only "[t]he amount of any improperly charged rents, determined at the time and place of the payment."

### 1.  *Alleged* **Casteel** *Error*

Shannon asserts that trial court reversibly erred in submitting Question 6 because it commingles valid and invalid theories of liability. *See Crown Life Ins. Co.*

*v. Casteel*, 22 S.W.3d 378, 388 (Tex. 2000) (op. on reh'g) ("[W]hen a trial court submits a single broad-form liability question incorporating multiple theories of liability, the error is harmful and a new trial is required when the appellate court cannot determine whether the jury based its verdict on an improperly submitted invalid theory."). Shannon argues that a breach of duty cannot be based on its attempt to dissolve the Partnership by Written Consent because "partners have no duty to remain partners."[5] Shannon further contends that a breach of duty cannot be based on "transactions that never closed, proposals that were rejected, or actions that had no legal effect," such as Shannon's various offers to purchase partnership units, the proposal to the Partnership to choose between renaming itself after Shannon or vacating the premises, and its attempts to obtain voting agreements from Drs. Hughes and Bolen. Shannon states in its brief that these theories cannot support a finding that it failed to comply with the duty of care it owed to the Partnership because these uncompleted transactions neither benefited Shannon nor harmed Triad.

We disagree that the jury could have based its answers on any of these scenarios. The damage question that is predicated on any finding that Shannon failed to comply with a common-law or statutory duty required the jury to determine the amount of "improperly charged rents" proximately caused by Shannon's "non-compliant conduct." Thus, the non-compliant conduct at issue was Shannon's agreement, as the Partnership's managing partner, to pay SRES the "improperly charged rents."

Some of the scenarios that Shannon alleges were improperly encompassed in Question 6 could not have been included for the additional reason that they were

---

[5] *Bohatch v. Butler & Binion*, 977 S.W.2d 543, 544 (Tex. 1998).

excluded by the accompanying instruction. The instruction informed the jury that Shannon owed a duty of care in conducting *the Partnership's* business, not Shannon's own business, and we presume the jury followed the charge instructions. *See Barnes v. Mathis*, 353 S.W.3d 760, 765 (Tex. 2011) (per curiam). In attempting to purchase partnership units, Shannon was conducting its own business, not Partnership business, and the renaming ultimatum was made by SRES, not by Shannon. As defined in the charge, "Shannon" meant only Shannon Medical Center and specifically excluded SRES and the Trust.

We conclude that the scenarios Shannon describes as invalid theories of liability were not submitted to the jury. They instead were merely factual matters that were admitted into evidence without objection or a request for a limiting instruction, and they were not encompassed in Question 6.

### 2. *The Partnership Agreement's Effect on the Duty of Care*

On appeal, Shannon also reurges its objection that the duty-of-care question "does not adequately address the partnership agreement and the alterations of the statutory duty of care." *See* TEX. BUS. ORGS. CODE ANN. §§ 152.206, 153.003. Shannon argues on appeal that the duty of care was contractually disclaimed and that Shannon's conduct was authorized.

As a matter of law, however, the duty of care cannot be disclaimed. *See id.* § 152.002(b)(3). A partner must conduct the partnership's business "with the care an ordinarily prudent person would exercise in similar circumstances." *Id.* § 152.206(a). A partner additionally must discharge the partner's duties "in good faith" and "in a manner the partner reasonably believes to be in the best interest of the partnership." *Id.* § 152.204(b). Although the Partnership Agreement authorizes contracts between the Partnership and a partner or a partner's affiliate, a partner entering into such a contract still must comply with the duty of care by acting in

10

good faith and in a manner the partner reasonably believes to be in the partnership's best interest. The Partnership Agreement could not change this and did not purport to do so.

The instructions accompanying this question tracked the statute. The instructions additionally clarified that "[a] partner does not violate a duty or obligation merely because the partner's conduct furthers the partner's own interest" and that "a[n] error in judgment does not by itself constitute a breach of the duty of care." Under these instructions, the jury could find that Shannon complied with its duty of care by entering into a contract with the Partnership that furthered Shannon's interest, so long as Shannon acted in good faith and reasonably believed that the contract also was in the Partnership's best interest. Because this charge correctly reflects both the governing law and the Partnership Agreement's terms, the trial court did not abuse its discretion in overruling Shannnon's objection. *See Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990) (op. on reh'g) (no abuse of discretion where controlling question was accompanied by instructions tracking statute's language).

## B.    The Evidence That Shannon Failed to Comply with Its Duty of Care

Shannon further asserts there is no evidence to support the jury's finding that Shannon failed to comply with its statutory duty of care. Because the jury returned an adverse finding on this issue on which Shannon bore the burden of proof, Shannon must demonstrate on appeal that the evidence conclusively established that it complied with its statutory duty of care. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001).[6] We review the record in the light most favorable to the

---

[6] In a footnote in its brief, Shannon states that it also objected to the three breach-of-duty questions on the ground that they improperly shifted the burden to Shannon. Shannon offers no argument or authority in support of that objection; thus, it too is waived. *See* TEX. R. APP. P. 38.1(i). We note, however, that under the common law, when a fiduciary enters into a transaction

11

challenged finding, crediting favorable evidence if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005) (per curiam). After reviewing the record in accordance with this standard, we hold that the evidence does not conclusively show that Shannon complied with its duty of care concerning the lease amendment.

Before the lease was renewed in 2012, SRES asked appraiser Dale Scoggins to analyze the fair-market rental value of the leased premises. Scoggins determined that the annual fair-market rental range was $18.50 to $19.25/sq. ft. In his report, Scoggins stated,

> The above rental amount does not include consideration of the amortization of the specialized items of tenant improvements (TI) that might be a part of a new lease agreement. The subject suite has two vaults that house linear accelerator equipment. The estimated costs for each of these vaults is $450,000 or a total of $900,000. These improvements were installed at the time of original construction. The building was built in 1988 making the improvements 24 years old. Typical economic life for medical office buildings is 50 years. The accrued depreciation attributable to the vault improvements would therefore be (24/50) 48%. . . . The depreciated value of the specialized TI is $468,000. Typically specialized TI is amortized over the primary lease term. In this case no amortization of this cost has occurred.

---

in which its self-interest might conflict with the beneficiary's interests, the fiduciary bears the burden to show compliance with the duty of care. *Stephens Cty. Museum, Inc. v. Swenson*, 517 S.W.2d 257, 260 (Tex. 1974). The Texas Business Organizations Code makes this burden-shifting rule applicable to alleged violations of statutory duties as well. *See* TEX. BUS. ORGS. CODE ANN. § 153.003 (in matters not addressed in Business Organizations Code chapter 153 dealing with limited partnerships, "the provisions of Chapter 152 governing partnerships that are not limited partnerships and the rules of law and equity govern"); *id.* § 152.003 ("The principles of law and equity and the other partnership provisions supplement this chapter unless otherwise provided by this chapter or the other partnership provisions."); *see also id.* §§ 152.004, 153.002(b) ("The rule that a statute in derogation of the common law is to be strictly construed does not apply" to the statute's partnership and limited-partnership provisions).

12

From these figures, Scoggins calculated that the post-depreciation cost of the two vaults, if amortized over a five-year term, would increase the annual rent by $11.79/sq. ft.

The day after receiving the report, Bryan Horner, both in his capacity as Shannon's CEO and as president of SRES, executed a lease amendment and sent it to Triad and the Partnership, enclosing a copy of Scoggins's report. The lease amendment states, "A market rental analysis prepared for SRES indicates that specialized tenant improvements *funded by the landlord*, such as the [Partnership] linear accelerator vaults, are typically amortized and reimbursed by the tenant."[7] The amendment called for annual rent of $31.04/sq. ft., which is the sum of the highest fair-market rental value found by Scoggins plus an additional $11.79/sq. ft. to "reimburse" SRES.

But Shannon knew that SRES did not fund the improvements that were made in 1988, because Shannon was the previous owner and transferred the building—with the vaults already in place—to SRES in 2007.

Moreover, there is legally sufficient evidence that the improvements also were not funded by Shannon. According to Horner, the building was constructed by the Trust, which then transferred ownership to Shannon, who later transferred the building to SRES.

Further still, the original lease indicates that the Partnership had no financial responsibility for improvements that were part of the original construction. Attached to the Partnership's original 1988 lease is an exhibit cover sheet that appears to give directions to clerical staff, stating, "Attach floor plan of demised premises showing . . . all improvements to be constructed by Landlord" and directing

---

[7] Emphasis added.

someone to type on the floor plan, "All improvements, equipment and furnishings shown hereon are to be constructed, furnished and installed at the sole cost and expense of Landlord." A private placement memorandum seeking investors in the Partnership identifies the Trust as the landlord.

Although the floor plan itself is missing from the lease, the building's 1987 blueprints show that the vaults are part of the original construction. The 1988 lease did not require the Partnership to pay for any part of the original construction but to pay only for those improvements that were added after the lease's "Commencement Date," which was defined as the date the Partnership "delivers written notice to Landlord that the demised premises are complete and fully suitable to [the Partnership] for the purpose for which same are leased."

From this evidence, the jury reasonably could conclude that the Trust assumed sole responsibility for the cost of constructing a building suitable for use as a radiotherapy center, and this included construction of the vaults shown on the blueprints.

The evidence also establishes that Shannon knew there was no support for the position taken in the 2012 lease amendment that "a rate of $31.04 per year per square foot (including reimbursement of specialized tenant improvements funded by SRES) is within the range of fair market value." Shannon knew that the vaults were included in the original construction nearly two decades before SRES acquired the building. Moreover, Scoggins asked for documentation of the costs of constructing the vaults, but because the vaults were included as an integral part of the building's original construction, Shannon could find none. To the contrary, Shannon's controller informed Horner, "The best I've been able to come up with for the 1988 vaults is a lease agreement that indicates [the] landlord is responsible for all leasehold improvements . . . ." Scoggins additionally explained to Horner, "*The TI increment*

14

is not included in the market rental amount as it *is not an aspect of market rent* but an individual modification to a building for a particular tenant rather than a feature that would be typical of the market."[8] Thus, Shannon knew that (1) the vaults were not a modification to the building, and thus, they were not a "tenant improvement"; (2) the Trust, not SRES, paid to construct the building, including the vaults; and (3) the vaults' construction-costs are not part of the building's fair-market rental value. There accordingly was no basis for Shannon, as the Partnership's managing general partner, to bind the Partnership to "reimburse" SRES for construction costs Shannon knew had been paid by the Trust in accordance with its agreement with the Partnership.

Although Shannon emphasizes that the Partnership Agreement permits the Partnership to contract with a partner's affiliate such as SRES, the agreement specifies that such contracts "must be competitive with the terms that the Partnership could obtain from third parties in an arm's length transaction." The Partnership was not renting space that SRES had modified at the landlord's expense to satisfy the Partnership's requirements; the Partnership was renting a space that already satisfied the Partnership's requirements without requiring the landlord to modify it. Scoggins's report shows that the highest annual fair-market rental value for the property was $19.25/sq. ft., and the record supports the finding that in binding the Partnership to pay SRES an additional $11.79/sq. ft., Shannon did not act "on an informed basis, in good faith, and in a manner [it] reasonably believed to be in the [Partnership's] best interest."

We conclude the jury's assessment of the Partnership's actual damages is amply supported by the evidence. We overrule Shannon's second issue, and we

---

[8] Emphasis added.

affirm the portion of the judgment awarding the Partnership actual damages as found by the jury.

## IV. TRIAD'S DISGORGEMENT AWARD

Shannon argues that Triad's disgorgement award must be reversed because, among other reasons, there is no evidence of Shannon's profits. We agree, and because this point is dispositive, we do not address Shannon's remaining challenges to this award.[9]

In determining the amount that equity required Shannon to disgorge to Triad, the trial court relied on the jury's answer to Question 9 of the charge, in which the jury was asked, "What was the amount of any improperly charged rent?" The jury answered, "$572,725.00."

But Texas law limits profit disgorgement to the amount of a fiduciary's profits obtained as a result of the fiduciary's breach of duty. *See Longview Energy Co. v. Huff Energy Fund LP*, 533 S.W.3d 866, 877–78 (Tex. 2017) (citing *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 873 (Tex. 2010)).[10] As Shannon pointed out at the charge conference, the Partnership paid the rent to its landlord SRES, and SRES is a corporation distinct from Shannon, SRES's sole shareholder. *See Grain*

---

[9] Shannon argues in its third issue that the disgorgement award cannot be supported by the jury's finding of fraud by non-disclosure in connection with the lease amendment, because (a) the claim was not pleaded, (b) Triad lacks standing to pursue the claim, and (c) there is no evidence of one or more elements of fraud by non-disclosure. In its fourth issue, Shannon contends that the trial court abused its discretion in ordering equitable disgorgement to Triad of Shannon's profits because (a) that request for relief was not pleaded, (b) there is no direct relationship between Triad and the amount to be disgorged, (c) no clear and serious breach occurred, and (d) there is no basis for the amount awarded. Under the latter subheading, Shannon argues that the rent was paid to SRES, not Shannon, and there is no evidence of Shannon's profits from the 2012 lease amendment. Because this point is dispositive of the judgment in Triad's favor, we do not address Shannon's other arguments.

[10] We address only the disgorgement of profits, not the forfeiture or disgorgement of fees, which are not at issue in this appeal.

16

*Dealers Mut. Ins. Co v. McKee*, 943 S.W.2d 455, 458 (Tex. 1997) ("Under Texas law, a corporation is an entity separate from its shareholders."). The excess rent was SRES's profit, not Shannon's, and Triad did not plead or litigate any basis for ignoring the distinction between the two entities. The extent to which Shannon profited from the excess rent paid to SRES was a question of fact[11] on which there is no finding and no evidence.

In response, Triad asserts that the damages Shannon now must pay to the Partnership "inure . . . primarily to Shannon's benefit as the [Partnership's] majority owner." But this argument misses the mark for several reasons. First, the judgment Shannon must pay to the Partnership is not Shannon's profit; it is Shannon's debt. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 31.008(h)(2) (party against whom judgment is rendered is a "judgment debtor"). Second, when Shannon pays the judgment, the money will inure to the Partnership's benefit, not to Shannon's. The extent of Shannon's partnership interest is irrelevant, because a partnership is "an entity distinct from its partners" and "[p]artnership property is not property of the partners." TEX. BUS. ORGS. CODE ANN. §§ 152.056, 152.101. Third, if Triad intends to imply that some part of the judgment that Shannon pays to the Partnership will later be repaid to Shannon in the form of a partnership distribution, this theory cannot support the judgment because there is no fact finding on the subject. And fourth, no evidence was offered that would have supported the submission of a question asking the jury to measure Shannon's profits from the improperly charged rents by the amount of a partnership distribution. The rent increase became effective in October 2012, and the evidence showed that the only distribution since that time was in January 2013. The distribution could not have included any improperly charged rent,

---

[11] *See Longview*, 533 S.W.3d at 877–78.

17

because the Partnership paid the rent to SRES, so the Partnership had no improperly charged rent to distribute.

For each of these reasons, we sustain Shannon's fourth issue in part, and we do not reach Shannon's remaining challenges to the judgment in Triad's favor. Because Triad's only recovery was the disgorgement award, which cannot stand, we reverse this part of the judgment and render judgment that Triad take nothing by its claims in its individual capacity.

## V. SHANNON'S CLAIM FOR JUDICIAL DISSOLUTION OF THE PARTNERSHIP

On application by a partner in a domestic partnership, a district court may order the winding up and termination of the partnership "if the court determines that it is not reasonably practicable to carry on the entity's business in conformity with its governing documents."[12] The jury was asked, "Is it reasonably practicable to carry on the Partnership's business in conformity with the governing documents, and the jury answered, "Yes." In its fifth issue, Shannon contends it is entitled to judicial dissolution of the Partnership because it conclusively established the contrary.

Citing *Wiess v. McFaddin*, 211 S.W. 337, 342 (Tex. App.—Beaumont 1919, no writ), Shannon argues that voting deadlock is a recognized basis for judicial dissolution of a partnership, and now that Shannon and Triad are the only partners, the two are bound to become deadlocked on important matters. But the evidence before us—and Shannon's own admission—easily distinguish the facts in this case from those in *Wiess*. In *Wiess*, all of the property of an unincorporated joint stock association was vested in a board of three trustees: Wiess, Kyle, and McFaddin. *Id.* at 338. Wiess died and was succeeded by one of his children; however, the joint-

---

[12] Act of May 13, 2003, 78th Leg., R.S., ch. 182, § 1, sec. 11.314(2), 2003 TEX. GEN. LAWS 267, 400–01 (amended 2009 & 2017; now codified at TEX. BUS. ORGS. CODE ANN. § 11.314(3)).

stock agreement provided that the election of a new trustee would not be complete unless a certificate of acknowledgment was signed by the two remaining trustees and the new trustee signed an acceptance of the trust. *Id.* at 338–39. Wiess's successor was elected, but McFaddin refused to sign the necessary certificate. *Id.* at 339. The court noted that it was decided in an earlier case that McFaddin could not be compelled to sign the certificate, and Kyle refused to act until the board was complete. *See id.* at 342 (citing *McFaddin v. Wiess*, 168 S.W. 486, 487 (Tex. App.—Galveston 1914, no writ)). Because it was impossible to operate the business in conformity with its governing documents, the court affirmed the business's judicial dissolution. *See id.*

No such deadlock does, or could, exist here. As Shannon admits, the Partnership Agreement provides that a deadlock may be broken "upon the 'Approval of the General Partners,'" which is defined as the approval by those general partners holding a majority of the partnership units. Shannon concedes that it can "break the deadlock on its own because it holds the majority" of the partnership units.

Shannon nevertheless speculates that "Triad would inevitably object to any effort by Shannon to resolve the deadlock on its own" and "would resort to a lawsuit." But "speculation is not evidence." *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 164 (Tex. 2004). Moreover, a partnership can carry on its business in accordance with its governing documents despite litigation between partners—and the Partnership has done so.

Shannon's arguments, and the record, fall far short of conclusively establishing that it is not "reasonably practicable to carry on the Partnership's business in conformity with its governing documents." We overrule this issue.

# VI. ATTORNEYS' FEES

A trial court has discretion to award the plaintiff reasonable attorneys' fees and expenses if the plaintiff is wholly or partly successful in prosecuting a derivative action. TEX. BUS. ORGS. CODE ANN. § 153.405. Moreover, the Partnership Agreement provides that in litigation between partners relating to the Partnership, the prevailing partner "shall be entitled to recover, in addition to all damages allowed by law and other relief, all court costs and reasonable attorney's fees incurred in connection therewith from the Partner or Partners not prevailing." Based on these provisions, the trial court ordered Shannon to pay Triad's and the Partnership's fees, expenses, and court costs. These amounted to almost $1.19 million in attorney's fees through trial, expenses of nearly $247,000, and over $12,000 in court costs. The trial court also conditionally awarded attorneys' fees of $75,000 in the event of an appeal to an intermediate court of appeals; $25,000 in the event that a petition for review is filed with the Texas Supreme Court, and $55,000 if the Texas Supreme Court requests briefing on the merits.

In its sixth issue, Shannon contends that the trial court erred in failing to condition the award of appellate attorneys' fees upon the success of the appeal, and in its seventh issue, Shannon argues that reversal of the judgment requires remand for a new trial on attorneys' fees, costs, and expenses. We agree with both points.

Awards of appellate fees must be conditioned upon a successful appeal. *See A.G. Edwards & Sons, Inc. v. Beyer*, 235 S.W.3d 704, 707 n.1 (Tex. 2007). Triad acknowledges this and does not oppose reformation of the judgment to expressly condition the award of appellate attorneys' fees upon Shannon's success on appeal; however, in light of our reversal of Triad's disgorgement award, the case must be remanded for a redetermination of the appropriate award of fees, costs, and expenses. *Cf. Young v. Qualls*, 223 S.W.3d 312, 314 (Tex. 2007) (per curiam)

20

("Although attorney's fees in this case were awarded by the trial court rather than the jury, the factors governing their assessment are the same and include consideration of the 'results obtained.'" (quoting *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997))).

We sustain Shannon's sixth and seventh issues, and we remand the case for for a new trial solely on the issues of attorneys' fees, reasonable expenses, and costs, and with instructions to the trial court to condition any award of appellate attorneys' fees on a successful appeal.

## VII. CONCLUSION

We overrule Shannon's arguments challenging the portion of the judgment awarding the Partnership actual damages for Shannon's breach of the duty of care, and we affirm this part of the judgment without reaching Shannon's arguments regarding the Partnership's remaining claims. We likewise affirm the portion of the judgment denying Shannon's request for judicial dissolution of the Partnership.

Because no evidence supports the trial court's disgorgement-of-profits award to Triad, we reverse this part of the judgment and render judgment that Triad take nothing by its claims in its individual capacity. In light of this result, we reverse the trial court's award of attorneys' fees, expenses, and costs, and we remand the case to the trial court for a new trial only on this ancillary relief, with any award of appellate attorneys' fees to be conditioned on a successful appeal.


/s/     Tracy Christopher
        Justice

Panel consists of Justices Christopher, Bourliot, and Zimmerer.

21