**Affirmed in Part, Reversed and Rendered in Part, Reversed and Remanded in Part, and Memorandum Opinion filed May 14, 2024.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-22-00727-CV

---

### PURE INVESTMENT GROUP, LLC AND YUNUS DOGAN, Appellants

### V.

### 11681 INTERESTS, LTD., Appellee

---

**On Appeal from the 152nd District Court**
**Harris County, Texas**
**Trial Court Cause No. 2015-76952**

---

## MEMORANDUM OPINION

In this landlord-tenant dispute involving a commercial lease, Appellants, Pure Investment Group, LLC and Yunus Dogan, appeal the trial court's judgment in favor of Appellee, 11681 Interests, Ltd. Appellants present three issues with numerous sub-issues. We affirm in part, reverse and render in part, and reverse and remand in part.

BACKGROUND

Pure Investment as the tenant and Appellee as the landlord entered into a five-year commercial lease on June 1, 2012. David Greenberg signed the lease on behalf of Appellee,[1] and Dogan signed the lease as Pure Investment's president and as guarantor. Pure Investment opened a restaurant (Harvest Grille) in the leased property (the "property"), which was in a shopping center off Westheimer Road that also housed another restaurant as well as stores like Kohl's. About a year later, Pure Investment asked Greenberg for approval to remodel the property into a hybrid restaurant and market/grocery store (a "groceraunt") called Harvest Market. In 2014, the remodeling was complete and Pure Investment operated its groceraunt.

By February 2015, Pure Investment had been hearing rumors that a Trader Joe's grocery store might be constructed on a parking lot adjacent to Harvest (and used by its customers) in the shopping center. Worried about whether Trader Joe's was in fact coming to the shopping center, Pure Investment's representatives, Dogan and Inci Akpinar, met with Greenberg on February 27, 2015. Dogan and Akpinar claimed that Greenberg had told them at the meeting that (1) he heard Kohl's was selling its property to Trader Joe's; (2) his permission was needed under a "Common Area Agreement" before Kohl's could finalize the transaction and Trader Joe's could build in the shopping center; and (3) he was not planning to grant permission. Greenberg denied making any such statements or promises.[2]

---

[1] More specifically, the lease provides that Greenberg signed the lease as president of DG Interests, Inc., which is the general partner of Appellee.

[2] The trial court excluded evidence (Defendants' exhibit 61) of the terms of a reciprocal easements and operating agreement ("REOA") between all the property owners in the shopping center, which required all owners' consent to reduce the available parking spaces; the construction of Trader Joe's on the parking lot adjacent to Harvest would have reduced the parking ratio from five parking spots per 1,000 square feet of retail to four parking spots.

Prior to hearing rumors about Trader Joe's coming to the center and the February 27, 2015 meeting, Dogan and Akpinar had asked Greenberg and Greenberg's property manager, Stephen Soussan, to market the property and find a new tenant. In a March 13, 2015 email to Dogan and Akpinar, Greenberg informed them that "another group has expressed interest" in the property; the offer asked for 4 months rental abatement to build out the property and get permits and also required Pure Investment to pay a standard commission. Dogan rejected the offer, thanked Greenberg for his help, explained that closing Harvest "right now will affect our image" as he was preparing to open groceraunts in three other locations, and stated he would like to keep Harvest open but "may evaluate again 6 months later."

Two weeks later, Greenberg emailed Dogan to tell him that "one of the groups that had inquired has contacted us and made a verbal offer to lease[;] [b]asically the offer consist[s] of the[m] taking over your lease position as it is." Greenberg also stated that Kohl's had sold its property adjacent to Harvest so that a Trader Joe's would be built there. In response, Dogan asked Greenberg to give him some time to think about the offer and asked whether (1) the group would take the property "as is"; and (2) Pure Investment would get its security deposit, sign, and equipment back. A day later, Dogan emailed Greenberg to inquire if he could visit with Greenberg to discuss the offer. Dogan claimed meeting with Greenberg in person about the offer but then receiving no further information; however, Akpinar testifed that Pure Investment did not accept the offer.

In April 2015, construction of the new Trader Joe's began. Pure Investment claimed it felt the effects of the construction and business declined by mid-May. It continued approaching Greenberg to find a new tenant for the property. In early September 2015, Pure Investment closed Harvest because it "couldn't survive." It

paid rent for September in full but had to pay the October rent in two installments; it did not pay rent for November and December. On November 11, 2015, it sent a letter to Appellee stating that it had "vacated the leased premises" and requesting that Appellee "immediately begin the process of locating another tenant to mitigate your damages, if any." In December 2015, Appellee changed the locks, sent a written demand for $961,053.64, and sued Appellants for breach of the lease agreement and guarantee. Appellants answered and brought counterclaims for common law fraud, statutory fraud, negligent misrepresentation, breach of contract, promissory estoppel, fraudulent transfer, and constructive eviction.

A jury trial was held from November 1, 2021, to November 10, 2021. Appellants claimed that the loss of the parking spaces as well as a blocked entrance, fencing, and noise from construction and equipment led to a decrease in customers which forced the closure of Harvest in September 2015. Appellee, however, claimed that Pure Investment's closing of Harvest had nothing to do with Trader Joe's construction or loss of parking spaces because it was a failing business for some time or Appellants would not have asked Appellee to find another tenant to take over the lease prior to the start of the Trader Joe's construction.

In support of their constructive eviction claim, Appellants sought to introduce business records and several emails between Greenberg and Bryan Vaughn, who was a development partner in Hawkins Companies—the developer for Trader Joe's. According to Appellants, business records and emails contained in Defendants' exhibit 61 would have informed the jury that from February to April 2015, and contrary to Greenberg's trial testimony, Greenberg (1) knew his approval was necessary before Trader Joe's could build in the planned location; (2) demanded that the developer pay him monetary compensation tied to the specific

4

monthly rent Pure Investment was paying; (3) refused an offer for $25,000 because that proposal would not cover one month rent; and (4) was paid $125,000 (representing four months of rent plus a commission fee) and, in exchange for that payment, Greenberg signed an agreement giving consent to amend the REOA to reduce the parking spaces in the shopping center which permitted Trader Joe's to build in the parking lot immediately adjacent to Harvest. The trial court excluded the offered exhibit.

The jury found against Appellants on all their claims, including constructive eviction, and in favor of Appellee on its breach of lease agreement claim, awarding damages accordingly. In December 2021, Appellants filed a motion to disregard the jury's answers to several damages questions, but the trial court denied the motion. On July 13, 2022, the trial court signed a final judgment in accordance with the jury's verdict. In August 2022, Appellants filed a motion for new trial which was overruled by operation of law.

## ANALYSIS

Appellants present three issues containing various arguments, which we address in turn.

### I.    Exclusion of Evidence

In their first issue, Appellants contend the trial court's refusal to admit Defendants' exhibit 61 constitutes harmful error requiring a new trial because (1) this evidence was relevant to (a) prove at least two elements of Appellants' constructive eviction claim, (b) "rebut Greenberg's denials as to these elements or impeach Greenberg with his own prior statements", and (c) rebut Appellee's "claimed damages for lost rental income"; (2) the probative value of this evidence is not substantially outweighed by the danger of unfair prejudice; and (3) exclusion

5

of this evidence was harmful.

## A.    Standard of Review and Governing Law

We review a trial court's exclusion of evidence for abuse of discretion.  *JBS Carriers, Inc. v. Washington*, 564 S.W.3d 830, 836 (Tex. 2018); *Caffe Ribs, Inc. v. State*, 487 S.W.3d 137, 142 (Tex. 2016).  If a trial court abuses its discretion and erroneously excludes evidence, the question is whether the error "probably caused the rendition of an improper judgment."  *JBS Carriers, Inc.*, 564 S.W.3d at 836; *see* Tex. R. App. P. 44.1(a).  This standard does not require the complaining party "to prove that 'but for' the exclusion of evidence, a different judgment would necessarily have resulted."  *JBS Carriers, Inc.*, 564 S.W.3d at 836 (*quoting State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009)).  Instead, if erroneously excluded evidence was "'crucial to a key issue,' then the error was likely harmful—that is, it probably caused the rendition of an improper judgment—unless the evidence was cumulative or the rest of the evidence was so one-sided that the error likely made no difference in the judgment."  *Id*. (*quoting Cent. Expressway Sign Assocs.*, 302 S.W.3d at 870).  An appellate court must uphold a trial court's evidentiary ruling if there is any legitimate basis for the ruling.  *Enbridge Pipelines (E. Tex.) L.P. v. Avinger Timber, LLC*, 386 S.W.3d 256, 264 (Tex. 2012); *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

Relevant evidence is presumed to be admissible.  Tex. R. Evid. 402; *JBS Carriers, Inc.*, 564 S.W.3d at 836.  Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Tex. R. Evid. 401; *JBS Carriers, Inc.*, 564 S.W.3d at 836.  However, under Rule 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger

6

of unfair prejudice, confusion of the issues, or misleading the jury." Tex. R. Evid. 403. When determining admissibility of evidence under Rule 403, a trial court must balance the probative value of the evidence against relevant countervailing factors. *JBS Carriers, Inc.*, 564 S.W.3d at 836. Evidence is not inadmissible "on the sole ground that it is 'prejudicial' because in our adversarial system, much of a proponent's evidence is legitimately intended to wound the opponent." *Diamond Offshore Servs. Ltd. v. Williams*, 542 S.W.3d 539, 549 (Tex. 2018). Instead, the proper inquiry is "unfair prejudice." *Id*. "'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id*. (*quoting Old Chief v. United States*, 519 U.S. 172, 180 (1997)).

## B.    Application

First, we address Appellants' argument that the trial court erred by not admitting the evidence because it was relevant to prove at least the first two elements of their constructive eviction claim and to rebut Greenberg's denials as to these elements or impeach him with his own prior statements.

### 1.    Constructive Eviction and Impeachment

"'A constructive eviction occurs when the tenant leaves the leased premises due to conduct by the landlord which materially interferes with the tenant's beneficial use of the premises.'" *Arredondo v. Vill. on the Lake, LTD*, No. 14-22-00169-CV, 2023 WL 8631465, at *6 (Tex. App.—Houston [14th Dist.] Dec. 14, 2023, no pet. h.) (*quoting Fid. Mut. Life Ins. Co. v. Robert P. Kaminsky, M.D., P.A.*, 768 S.W.2d 818, 819 (Tex. App.—Houston [14th Dist.] 1989, no writ)). Texas law relieves a tenant of contractual liability for any remaining rentals due under the lease if the tenant can establish a constructive eviction by the landlord. *Id*.; *1221 Eldridge Rd., Inc. v. Life Changing Ministries & Fellowship, Inc.*, No.

01-14-00893-CV, 2016 WL 268689, at *8 (Tex. App.—Houston [1st Dist.] Jan. 21, 2016, pet. denied) (mem. op.). "Constructive eviction essentially terminates mutuality of obligation as to the lease terms, because the fundamental reason for the lease's existence has been destroyed by the landlord's conduct." *Downtown Realty, Inc. v. 509 Tremont Bldg., Inc.*, 748 S.W.2d 309, 313 (Tex. App.—Houston [14th Dist.] 1988, no writ).

The elements of a cause of action for constructive eviction are (1) an intention on the part of the landlord that the tenant shall no longer enjoy the premises, (2) a material act by the landlord that substantially interferes with the tenant's intended use and enjoyment of the premises, (3) an act that permanently deprives the tenant of the use and enjoyment of the premises, and (4) abandonment of the premises by the tenant within a reasonable time after the commission of the act. *Arredondo*, 2023 WL 8631465, at *6; *Willow Creek Golf Club, Inc. v. Willow Creek Mgmt., Inc.,* No. 14-21-00727-CV, 2023 WL 166836, at *9 (Tex. App.—Houston [14th Dist.] Jan. 12, 2023, no pet.) (mem. op.).

Appellants claim the excluded evidence was relevant because it constituted "the only direct evidence" of the first two elements of their constructive eviction claim. Appellants contend that Greenberg signing a "Side Letter Agreement" with Hawkins Companies giving consent to modify the REOA (*i.e.*, reduce the parking spaces in the shopping center by more than 2%) to allow construction of Trader Joe's competing business on the parking lot adjacent to Harvest and used by Harvest's customers, which in turn caused "the blockage and closure of the entrance primarily used by Harvest's largest customer base and drove away customers," was a material act by the landlord that substantially interfered with the use and enjoyment of the property. According to Appellants, the excluded evidence would provide "the final link" showing how Appellee "is responsible for

8

the construction of Trader Joe's" which "impacted ingress and egress to and from" Appellants' business as well as caused loss of parking spaces.

Additionally, Appellants contend the excluded evidence was "the only <u>direct</u> evidence of Landlord's intention that Pure [Investment] no longer enjoy the premises" because "[t]hat intention may be inferred from Greenberg's demands for compensation for four months' rental income at the rate paid by Pure [Investment] and Greenberg's complaints that a payment of $25,000.00 was 'not acceptable' because it 'won't **cover one months rent**.'" Further, Appellants assert that the excluded evidence was relevant and necessary "to rebut Greenberg's denials as to these elements or impeach Greenberg with his own prior statements" concerning these elements.

Citing *1221 Eldridge Road, Inc.*, Appellee counters that the trial court correctly excluded Defendants' exhibit 61 because the excluded evidence is irrelevant to Appellants' constructive eviction claim and any potential impeachment relating to that claim when Appellants cannot prevail on their constructive eviction claim. Appellee contends that Greenberg had a right under the parties' lease agreement to engage in the conduct documented in the emails contained in exhibit 61 (*i.e.*, consent to make amendments to parking allocation and the number of parking spaces in the shopping center and get compensated in return) and Appellants thus "cannot complain that such conduct interfered with Appellants' use and enjoyment of the leased space."

In *1221 Eldridge Road, Inc.*, the tenant rented two properties: a space at 1255 Eldridge Road and a space adjacent thereto at 1243 Eldridge Road. *Id*. at *1. At one point, the tenant asked to negotiate a single lease for both properties but the landlord responded with a letter requesting payment for past water usage, sign fees, and unpaid rent and late fees before it would consider extending the lease for the

9

1255 property. *Id.* at *2. After the tenant asked to settle the dispute for $1,500, the landlord responded with a final default notice in which it stated that the tenant owed over $7,000 in unpaid rent and fees and it would not negotiate a new lease until all outstanding amounts had been paid in full. *Id.* The tenant vacated both properties and the landlord sued the tenant for breach of both leases. *Id.* The tenant asserted that the landlord's demand to pay all outstanding amounts or vacate the 1255 property also forced the tenant to vacate the 1243 property and therefore constituted constructive eviction from the 1243 space. *Id.* at *8.

The First Court of Appeals disagreed and found that the conduct about which the tenant complained was authorized under the terms of the leases and, accordingly, could not constitute a substantial interference with the tenant's use and enjoyment of the property. *Id.* The court concluded that when the complained-of conduct is authorized by the contractual terms of the lease, there can be no constructive eviction as there is no material act by the landlord that substantially interferes with the tenant's intended use and enjoyment of the premises. *See id.* The court thus held there was legally insufficient evidence to support a constructive eviction claim, and the trial court erroneously denied the landlord's motion to disregard the jury's finding that the landlord constructively evicted the tenant. *Id.*

In this case, section 11.1 of the parties' lease provides as follows:

> 11. COMMON AREAS. When, In fact, there are Common Areas, then the following shall apply:
>
> 11.1 Definitions. The phrase "Common Areas" means all areas and facilities outside the Premises that are provided and designated for general use and convenience of Tenant and other tenants and their respective officers, agents, and employees, customer[s], and invitees. Common Areas include (but are not limited to) pedestrian sidewalks, landscaped areas, roadways, *parking areas*, and railroad track, if any.

*Landlord reserves the right from time to time to make changes in the shape, size, design, style, location, number, and extent of the land and improvements constituting the Common Areas.* Landlord may designate from time to time additional parcels of land for use as a part thereof; and any additional land so designated by Landlord for such use shall be included until such designation is revoked by Landlord.

(emphasis added). By its plain language, the lease authorized Greenberg to change the parking areas in size, shape, location, number, etc. *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005) ("Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense."); *Tamasy v. Lone Star Coll. Sys.*, 635 S.W.3d 702, 709 (Tex. App.—Houston [14th Dist.] 2021, no pet.) (same). Therefore, Greenberg was contractually permitted under the lease to change the location and reduce the number of parking spaces. The excluded evidence contained in exhibit 61 shows that Greenberg negotiated payment in return for his consent to amend the REOA to reduce the available parking spaces in the shopping center and thereby allow the construction of Trader Joe's on the parking lot adjacent to Harvest.

Following the pronouncements in *1221 Eldridge Road, Inc.*, we conclude that because Appellee had the right to change the number and location of parking spaces in common areas and there was nothing in the lease entitling Appellants to the specific parking spaces where Trader Joe's was built, there can be no constructive eviction; the conduct about which Appellants complain was authorized under the lease and could not constitute a substantial interference with tenant's use and enjoyment of the leased property.

Appellants contend in their reply brief that Appellee failed to preserve its argument that the trial court correctly excluded exhibit 61 because the evidence is irrelevant to Appellants' constructive eviction claim and any potential

11

impeachment relating to that claim when Greenberg had a right under section 11.1 of the parties' lease agreement to engage in the conduct documented in exhibit 61 and Appellants, therefore, cannot prevail on their constructive eviction claim. In that regard, Appellants contend that Appellee's "arguments about this clause are in the nature of a defense to [Appellants'] constructive eviction claim," citing in support *Briargrove Shopping Center Joint Venture v. Vilar, Inc.*, 647 S.W.2d 329 (Tex. App.—Houston [1st Dist.] 1982, no writ). According to Appellants, Appellee "waived this defense by failing to request its inclusion, in any form, in the jury charge."

However, Appellants misplace their reliance on *Briargrove*; the court of appeals in that case made no statement that a contractual clause is a defense to a constructive eviction claim requiring a landlord to request inclusion of a defense instruction in the jury charge to preserve reliance on a contractual clause. *Id*. at 329-38. Nor do Appellants cite any other authority that supports their assertions.

We also find unpersuasive Appellants' contention that *1221 Eldridge Road, Inc.* "is unhelpful here" because the case did not "address any issue about admissibility of evidence" but was a decision on the merits of the tenant's constructive eviction claim. Although the court of appeals' decision was on the merits, this does not negate the court's finding that when the complained-of conduct is authorized by the contractual terms of the lease, there can be no constructive eviction as there is no material act by the landlord that substantially interferes with the tenant's intended use and enjoyment of the property. *See 1221 Eldridge Road, Inc.*, 2016 WL 268689, at *8. Thus, evidence that allegedly would establish a material act by the landlord that substantially interferes with the tenant's intended use and enjoyment of the property would be irrelevant because the tenant could not prevail on a constructive eviction claim and exclusion of that

12

evidence would not be erroneous.

Because Greenberg had the right under the parties' lease to reduce the number and change the location of parking spaces in the shopping center, his conduct could not have constituted a substantial interference with Appellants' use and enjoyment of the leased property necessary to establish a constructive eviction claim. *Id.* The excluded evidence would only have shown what Greenberg was authorized to do under the lease; the excluded evidence could not have established and was thus not relevant to Appellants' constructive eviction claim and any potential impeachment relating to that claim when Appellants could not prevail on their constructive eviction claim. *See id.* Accordingly, we conclude that the trial court did not err in excluding exhibit 61.

## 2. Damages for Lost Rental Income

Appellants also claim "[e]vidence that Landlord was paid $125,000 for consenting to have a competing store built directly adjacent to its tenant—and that Landlord claimed that money was necessary to compensate it for four months of lost rental income—was relevant to determining what amount of lost-rental income, if any, was caused by Pure [Investment]'s actions—an important factual matter for the jury."

Assuming *arguendo* that the trial court erroneously excluded the evidence contained in exhibit 61 because it was relevant to determine the amount of damages for lost rental income, Appellants have made no argument that (and how) they were harmed by the alleged erroneous exclusion of the evidence in that regard. To show the trial court reversibly erred in excluding evidence, "a complaining party must demonstrate that the trial court erred in excluding the evidence, the evidence was controlling on a material issue dispositive to the case, and the error probably caused rendition of an improper judgment." *See Ron v.*

13

*Ron*, 604 S.W.3d 559, 574 (Tex. App.—Houston [14th Dist.] 2020, no pet.); *Coterill-Jenkins v. Tex. Med. Ass'n Health Care Liab. Claim Tr.*, 383 S.W.3d 581, 593 (Tex. App.—Houston [14th Dist.] 2012, pet. denied); *see also Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000). "It is the complaining party's burden, not ours, to show harm from an erroneous evidentiary ruling." *Coterill-Jenkins*, 383 S.W.3d at 593 (citing *In re M.S.*, 115 S.W.3d 534, 538 (Tex. 2003)); *see also Ron*, 604 S.W.3d at 574.

Because Appellants do not explain how the exclusion of exhibit 61 probably resulted in an improper judgment and neglected to show the required harm, they failed to establish that the trial court reversibly erred in excluding the evidence. *See Ron*, 604 S.W.3d at 574. Accordingly, we overrule Appellants' first issue.

## II.     Damages Awards

In their second issue, Appellants present several arguments. We begin by addressing Appellants' complaints about the jury's damages awards.

### A.     Standard of Review

In reviewing a legal sufficiency challenge to the evidence, we view the evidence in the light most favorable to the finding, crediting favorable evidence if a reasonable factfinder could do so, and disregarding contrary evidence unless a reasonable factfinder could not do so. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We may not sustain a legal sufficiency challenge unless the record demonstrates that: (1) there is a complete absence of a vital fact; (2) the court is barred by the rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence to prove a vital fact is no more than a scintilla; or (4) the evidence established conclusively the opposite of the vital fact. *Id*. at 810. The factfinder is the sole judge of the witnesses'

14

credibility and the weight to give their testimony. *Id*. at 819.

In a factual sufficiency review, we examine in a neutral light the evidence that both supports and contradicts the jury's finding. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam); *S. Indus. Engines, LLC v. Baxter*, No. 14-23-00239-CV, 2024 WL 931782, at *5 (Tex. App.—Houston [14th Dist.] Mar. 5, 2024, no pet. h.) (mem. op.). We consider and weigh all of the evidence and set aside the challenged finding only if the evidence that supports the finding is so weak as to make the verdict clearly wrong and manifestly unjust. *Baxter*, 2024 WL 931782, at *5. Nonetheless, we defer to the jury's implicit determinations of credibility and weight to be given to the evidence. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

"We apply the above standard mindful of Texas's long-settled deference to the factfinder's discretion to fix appropriate and reasonable damage amounts." *Vast Constr., LLC v. CTC Contractors, LLC*, 526 S.W.3d 709, 723 (Tex. App.— Houston [14th Dist.] 2017, no pet.). Under Texas law, "whether to award damages and how much is uniquely within the fact finder's discretion." *Golden Eagle Archery, Inc.*, 116 S.W.3d at 772; *Vast Constr., LLC*, 526 S.W.3d at 723. A jury has broad discretion to award damages within the range of evidence presented at trial. *Vast Constr., LLC*, 526 S.W.3d at 723 (citing *MEMC Pasadena, Inc. v. Riddle Power, LLC*, 472 S.W.3d 379, 408 (Tex. App.—Houston [14th Dist.] 2015, no pet.)).

A jury's damages finding will not be disregarded merely because its reasoning in arriving at its figure may be unclear; there is no requirement that a damages award match up precisely with figures presented at trial. *Baxter*, 2024 WL 931782, at *6. When the evidence at trial supports a range of damages, an award within that range is an appropriate exercise of the jury's discretion, and we

may not speculate on how the jury actually arrived at its award. *Vast Constr., LLC*, 526 S.W.3d at 723-24; *see also Vela v. Wagner & Brown, Ltd.*, 203 S.W.3d 37, 49 (Tex. App.—San Antonio 2006, no pet.).

## B. Repair Damages

First, Appellants contend that the jury's finding of $100,000 in repair damages in Question 3.d. is not supported by legally and factually sufficient evidence. In that respect, Appellants contend Appellee was required to prove the amount of reasonable and necessary repair damages caused by Appellants' breach of the lease, and Appellee could have accomplished this by showing that (1) Appellee either repaired the property or paid some amount of money to someone else to repair it; (2) Appellee incurred repair expenses "in some other form, such as an identifiable amount of money in rental concessions to future tenants, and those tenants made repairs with that rent-abatement money"; or (3) the property still needs to be repaired. We disagree.

> Question 3.d. of the jury charge provides as follows:
>
> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate 11681 Interests, Ltd. for its damages, if any, that resulted from [Appellants'] failure to comply [with the lease agreement]?
>
> d.     The reasonable and necessary cost for repair damages to the premises.
>
> Answer:     $100,000

Nothing in this question requires Appellee to present evidence that it in fact paid or incurred repair damages; rather, it asks the jury to award the "reasonable and necessary cost for repair damages to the premises." There was no objection to this jury question, as Appellants acknowledge in their brief; therefore, "it is the court's charge, not some other unidentified law, that measures the sufficiency of the

16

evidence." *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000).

Here, longtime general contractor and senior project manager John Cibik testified that Greenberg had asked him "to put together a proposal to put the Harvest Grille space back into the condition it was when" Appellants took over the space. Cibik was familiar with how the property looked prior to Harvest moving in. He testified that he went to the space in December 2015 and determined, "based on [his] knowledge, skill, expertise, training and/or education," that it would cost $342,541.23 to repair the space. He explained what and why repairs were necessary and their cost. He opined that $342,541.23 was a reasonable and necessary cost to repair the property to return it to the condition it was in before Appellants took over the property.

Thus, Appellee presented evidence that the "reasonable and necessary cost for repair damages to the premises" is $342,541.23. Appellants argued at trial that Appellee does not "have any damages" and does not "deserve anything." The jury awarded Appellee $100,000 in repair damages; that the jury decided to award less than the amount Appellee presented as reasonable and necessary cost for repair does not render the evidence legally or factually insufficient to support the jury's repair damages award. "At the end of the day, we afford the jury discretion in awarding damages within the range of evidence presented at trial." *Gunn v. McCoy*, 554 S.W.3d 645, 671 (Tex. 2018); *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 713 (Tex. 2016). There is no requirement that the evidence show precisely how the jury arrived at the specific amount awarded nor is the jury tied to awarding damages exactly as requested by the injured party. *Vast Constr., LLC*, 526 S.W.3d at 723.

Accordingly, we conclude the evidence is legally sufficient and not factually insufficient to support the jury's finding of $100,000 in repair damages in Question

17

3.d., and we overrule Appellants' second issue with regard to their repair damages complaint. [3]

## C.    Damages for Re-Leasing Expenses

Second, Appellants assert there is legally insufficient evidence[4] to support the jury's award of $43,500 in damages for re-leasing expenses because Appellee only presented evidence of how much Greenberg paid in real-estate commission to the brokers who procured a new lease with tenant Beer Nation, but there is no evidence that any expenses were reasonable. Appellants assert that Appellee was required to present evidence of reasonable and necessary re-leasing expenses because Question 3.f. asked the jury to award "Reasonable and necessary expenses incurred in attempting to re-lease the premises after Pure Investment Group, LLC breached the lease agreement." We agree.

Under the plain langauge of Question 3.f., the jury was required to apply a measure of damages based on Appellee's reasonable and necessary expenses incurred in attempting to re-lease the property. Because there was no objection to this jury question, we measure the sufficiency of the evidence to support the jury's finding in response to the question using the charge submitted to the jury. *See Osterberg*, 12 S.W.3d at 55.

As we stated in *GHP Nail Systems, LLC v. Benelux Cosmetics B.V.*, parties generally have the freedom to choose to pay unreasonably high prices for goods and services. 651 S.W.3d 574, 582 (Tex. App.—Houston [14th Dist.] 2022, no

---

[3] We note that Appellants' complaint focused on a legal sufficiency challenge. Appellants only made one reference to factual sufficiency of the evidence and stated: "Alternatively, there is factually insufficient evidence to support this finding."

[4] Despite stating in their issue heading that "[t]here is legally and factually insufficient evidence of Landlord's 'reasonable and necessary' re-leasing expenses[,]" Appellants only present a legal sufficiency challenge.

18

pet.) (citing *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 129 (Tex. 2004) (orig. proceeding)).  However, because of this freedom, evidence merely of the amounts charged or paid, the amount of the expense incurred, the nature of the expense, the character of and need for the expense is not legally sufficient evidence that an expense is reasonable, but separate evidence must be offered that raises a fact issue regarding the reasonableness of the expense in question.  *Id.*  (citing *McGinty v. Hennen*, 372 S.W.3d 625, 627-28 (Tex. 2012) (per curiam) and *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 200-01 (Tex. 2004) (per curiam)).

Here, Greenberg testified that Appellee paid $87,000 in commission to brokers to re-lease the property.  Greenberg explained that the commission was calculated based on a percentage of the Beer Nation lease value, namely 6% of $1,500,000 in rent Beer Nation was supposed to pay over the lease term.  But Appellee presented no evidence at trial, as required by the jury charge, that any of Appellee's expenses was reasonable.  Paid out-of-pocket expenses do not establish that the incurred expenses are reasonable.  *See id.*  at 582, 584.  Thus, Greenberg's testimony that Appellee incurred $87,000 in re-leasing expenses is legally insufficient evidence to support a finding that this amount or any amount is a reasonable expense; some other evidence that re-leasing expenses were reasonable and in what amount was required.  *See id.*  at 584.  We conclude that the evidence presented at trial is legally insufficient to support the jury's finding in Question 3.f. and legally insufficient to support a finding that Appellee suffered any damages under the measure of damages submitted in that jury question.

Accordingly, we sustain Appellants' second issue with respect to their re-leasing expenses damages complaint, and we reverse the trial court's judgment in part and render judgment to reflect that Appellee take nothing against Appellants

for re-leasing expenses and any associated pre- and post-judgment interest.

### D.      Furniture and Equipment Damages

Third, Appellants present an alternative argument.  They ask us to affirm the jury's zero damages finding for reasonable and necessary costs for furniture, fixture, and equipment if we sustain their first issue and reverse the case for a new trial determining the trial court reversibly erred in excluding Defendants' exhibit 61 because Appellee moved for judgment on the entire verdict and, therefore, "embraced the jury's verdict, including its 'zero' answer on [Appellee]'s claims for furniture, fixtures, and equipment."

Because we have not sustained Appellants' first issue and we are not reversing the case for a new trial based on the asserted evidentiary issue, we need not address Appellants' alternative argument; we overrule it as moot.

### E.      Security Deposit

Fourth, Appellants contend the trial court erred by failing to offset the judgment's damages award to reflect that Appellee retained Appellants' $100,000 security deposit when the evidence was conclusive that Appellants were entitled to the return of the security deposit and, thus, were entitled to a $100,000 offset against any damages awarded to Appellee.  Appellants contend they pleaded offset and, because the evidence conclusively showed the amount and right to the offset, "[n]o jury finding was necessary to establish these undisputed facts."  Appellee responds that "the right to an offset is an affirmative defense, and the burden of pleading offset and of proving facts necessary to support it are on the party making the assertion.  As such, Appellants have waived this issue because they failed to make any objection to the jury charge regarding this matter."  Appellee does not address Appellants' contention that conclusively established matters need not and

20

should not be submitted to the jury for determination.

Rule 279 provides that any issues excluded from the jury charge that are "not conclusively established under the evidence and no element of which is submitted or requested are waived." Tex. R. Civ. P. 279; *May v. Ticor Title Ins.*, 422 S.W.3d 93, 100 (Tex. App.—Houston [14th Dist.] 2014, no pet.). "The right of offset is an affirmative defense." *Brown v. Am. Transfer & Storage Co.*, 601 S.W.2d 931, 936 (Tex. 1980); *Qin v. Yang*, No. 14-22-00197-CV, 2023 WL 4783550, at *10 (Tex. App.—Houston [14th Dist.] July 27, 2023, pet. filed) (mem. op.). A claim or defense is not waived under Rule 279 when the evidence conclusively establishes the necessary elements, even if none of the elements are submitted to the jury for consideration. *See May*, 422 S.W.3d at 100; *Bank of Tex. v. VR Elec., Inc.*, 276 S.W.3d 671, 677 (Tex. App.—Houston [1st Dist.] 2008, pet. denied).

When the evidence conclusively establishes a claim or defense, it may be part of the judgment even if a jury question on the claim or defense was not submitted. *See VR Elec., Inc.*, 276 S.W.3d at 677 (citing *City of Keller*, 168 S.W.3d at 814-15 ("Jurors are not free to reach a verdict contrary to [the] evidence; indeed uncontroverted issues need not be submitted to a jury at all.")); *cf. Longview Energy Co. v. Huff Energy Fund LP*, 533 S.W.3d 866, 874 (Tex. 2017) ("uncontroverted issues do not need to be submitted to a jury"). Thus, we turn to the record to determine whether the evidence conclusively established Appellants' right to the security deposit in the amount of $100,000.

Here, the evidence shows that Dogan gave Appellee a $100,000 check as a security deposit as required by the lease. Greenberg testified that Appellee had not returned the $100,000 security deposit to Appellants. He also testified that Appellee initially failed to give Appellants a credit in the amount of the security

deposit in its original damage model. Acknowledging Appellants were entitled to their security deposit, Greenberg testified that it was "an oversight on our part" and a "mistake" to not give Appellants a credit. Appellee's counsel also acknowledged that Appellants are entitled to a credit in the amount of the security deposit. And Greenberg testified that Appellee is "giving them a credit for a $100,000 for their security deposit" because "that's the rules." Appellee's damage model, which was admitted into evidence, confirms that Appellee allotted a credit to Appellants for their security deposit in the amount of $100,000. Appellee agreed that Appellants were entitled to a $100,000 credit toward any damages award in Appellee's favor.

Based on our review of the record, we conclude the evidence conclusively established that Appellants were entitled to the return of their security deposit in the amount of $100,000 and, therefore, no submission of Appellants' affirmative defense of offset was required nor was the defense waived under Rule 279. *See May*, 422 S.W.3d at 100; *VR Elec., Inc.*, 276 S.W.3d at 677. Appellants were entitled to a $100,000 offset against the Appellee's damages award, and the trial court erred by failing to offset that amount in the judgment. *See VR Elec., Inc.*, 276 S.W.3d at 677.

Accordingly, we sustain Appellants' second issue with regard to their security deposit complaint, and we reverse the trial court's judgment in part and render judgment to reflect Appellee's damages award be reduced by $100,000 and any pre- and post-judgment interest regarding that amount be deleted.

## III. Attorney's Fees

Finally, Appellants argue in their second issue that we should reverse and remand this case for a redetermination of attorney's fees because "the issue of attorney's fees should be retried if the damages awarded are reduced on appeal" as is the case here. Appellants claim the trial court's attorney's fees award was based

22

on Appellee's recovery of $462,459.35 in actual damages but, according to Appellants, that award must be reduced by $243,500 ($100,000 repair damages, $43,500 re-leasing damages, and $100,000 offset for security deposit), thus requiring a retrial of attorney's fees.

When an amount of damages is meaningfully reduced on appeal, the issue of attorney's fees should ordinarily be retried unless we are "reasonably certain" that the factfinder was not significantly influenced by the erroneous damages award. *See Young v. Qualls*, 223 S.W.3d 312, 314-15 (Tex. 2007) (per curiam); *Barker v. Eckman*, 213 S.W.3d 306, 314 (Tex. 2006); *Guardian Transfer & Storage Inc. v. Behrndt*, No. 14-14-00635-CV, 2016 WL 1267911, at *14 (Tex. App.—Houston [14th Dist.] Mar. 31, 2016, no pet.) (mem. op.).

As we discussed, the damages award of $462,459.35 must be reduced by $143,500 (deleting $43,500 for awarded re-leasing damages and crediting $100,000 for Appellants' security deposit). Considering the value of the difference between the erroneous and correct amounts of damages and the fact that we reduced the trial court's damages award by nearly one-third, we cannot be reasonably certain that the erroneous damages award had no significant influence on the trial court's attorney's fees award. *See Young*, 223 S.W.3d at 314-15; *Barker*, 213 S.W.3d at 314; *Cont'l Motors, Inc. v. Danbury Aerospace, Inc.*, No. 04-19-00059-CV, 2020 WL 1540378, at *9 (Tex. App.—San Antonio Apr. 1, 2020, no pet.) (mem. op.) (after reducing the recovery by approximately one-third, court was not reasonably certain the factfinder was not significantly affected by erroneous damages award); *Smith v. Overby*, No. 04-15-00436-CV, 2016 WL 4444437, at *8 (Tex. App.—San Antonio Aug. 24, 2016, no pet.) (mem. op.) ("This court's resolution of this appeal resulted in a reduction of the actual damages awarded to the Overbys by $13,987.38, which is approximately 17

percent. This court notes the jury's attorneys' fee award matches exactly the fees detailed in the Overbys' case billing. Although the attorneys' fees awarded matches the billing details, this court cannot be reasonably certain the jury was not significantly affected by the erroneous damage award."); *Azad v. MRCO, Inc.*, No. 14-12-00165-CV, 2013 WL 6700285, at *17 (Tex. App.—Houston [14th Dist.] Nov. 7, 2013, pet. denied) (sub. mem. op.) ("The MarinaGate award accounted for almost a third of the total amount awarded as lost profits. This circumstance makes it appropriate to reverse and remand for a retrial of the amount of attorney's fees."); *Daftary v. Prestonwood Mkt. Square, Ltd.*, 399 S.W.3d 708, 713 (Tex. App.—Dallas 2013, pet. denied) ("Here, because the amount of damages for the first agreement accounts for over one third of the total damages, we cannot be reasonably certain that the trial court was not significantly influenced by the erroneous damage award."); *rePipe, Inc. v. Turpin*, 275 S.W.3d 39, 51 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (after reducing award by approximately one-sixth, court was not reasonably certain the factfinder was not significantly affected by erroneous damages award).

Therefore, the case must be remanded to the trial court for a new trial on attorney's fees. *See Young*, 223 S.W.3d at 315; *Barker*, 213 S.W.3d at 314. Accordingly, we sustain Appellants' second issue with respect to their attorney's fees complaint, and we reverse the judgment in part and remand the case to the trial court for further proceedings limited to a redetermination of attorney's fees.

## IV. Guarantor

In their third issue, Appellants assert that because the parties stipulated the liability of Appellant Dogan is solely vicarious as the guarantor of Appellant Pure Investment's obligations under the lease agreement, any reversal or modification of the trial court's judgment should also apply to Dogan.

The parties stipulated "that in the event that there is a finding against Pure Investment Group, Inc., LLC, that will be binding upon the owner Dogan pursuant to his guarantee," and the trial court's judgment reflects that stipulation.[5] A guarantor's liability is measured by the principal's liability. *Res. Sav. Ass'n v. Neary*, 782 S.W.2d 897, 899 (Tex. App.—Dallas 1989, writ denied); *Hercules Expl., Inc. v. Halliburton Co.*, 658 S.W.2d 716, 724 (Tex. App.—Corpus Christi 1983, writ ref'd n.r.e.). Our pronouncements and holdings with regard to Pure Investment equally apply to Dogan; accordingly, we sustain Appellants' third issue.

## CONCLUSION

We reverse the trial court's judgment in part and render judgment to reflect that (1) Appellee take nothing against Appellants for re-leasing expenses (a $43,500 reduction in damages) and any associated pre- and post-judgment interest; and (2) Appellee's damages award be reduced by $100,000 (a credit for Appellants' $100,000 security deposit) and any associated pre- and post-judgment interest regarding that amount. We reverse the award of attorney's fees and remand the case to the trial court for a new trial only on attorney's fees. We affirm the remainder of the judgment.

/s/    Meagan Hassan
        Justice

---

[5] The judgment states: "The parties announced and stipulated that if the jury found against Defendant, Pure Investment Group, LLC, then the individual Defendant, Yunus Dogan, as a result of his personal guarantee would be liable to Plaintiff, 11681 Interests, Ltd, to the same extent Defendant, Pure Investment Group, LLC, was liable to Plaintiff, 11681 Interests, Ltd."

25

Panel consists of Justices Spain, Hassan, and Wilson.